N. Joshua Dart, W.S.B. No. 7-4634
Dart Law Firm, P.C.
Guaranty Bank Building
1401 South Taft Avenue, Suite 203
Loveland, Colorado 80537
970 818 2818
*nj@dartfirm.com*

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2015 APR 14   AM 11 48

STEPHAN HARRIS, CLERK
CHEYENNE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| DANA L. CARDINAL, an individual, | Civil Action No. *15 CV 55 —S* |
| Plaintiff, | |
| vs. | PLAINTIFFS' ORIGINAL COMPLAINT |
| KINDRED HEALTHCARE, INC., a Delaware Corporation, KINDRED NURSING CENTERS WEST, L.L.C. a Delaware Company, doing business as KINDRED TRANSITIONAL CARE AND REHABILITATION-CHEYENNE, KINDRED REHAB SERVICES, INC., a Delaware Corporation, KINDRED HEALTHCARE OPERATING, INC., a Delaware Corporation, | |
| Defendants. | |

Dana L. Cardinal, by and through undersigned counsel, for claims and relief against the Defendants, would state and allege as follows:

## PARTIES

1.      Plaintiff Dana L. Cardinal ("Ms. Cardinal") is an individual who is a citizen of the State of Wyoming.

2.      Plaintiff is informed and believes that Kindred Healthcare, Inc., is a corporation formed and existing under the laws of the State of Delaware, with its headquarters and principal place of business in the State of Kentucky, but doing business in the State of Wyoming sufficient to confer personal jurisdiction over this Defendant. Defendant Kindred Healthcare, Inc. does not have a registered agent for service of process in the State of Wyoming, service of process may be made according to the laws of the State of Delaware by serving the Secretary of State of Delaware.

3.      Plaintiff is informed and believes that Defendant, Kindred Nursing Centers West, L.L.C. is a limited liability company formed and existing under the laws of the State of Delaware, with its principal place of business in the State of Kentucky, but doing business in the State of Wyoming as well as doing business under the trade name "Kindred Transitional Care and Rehabilitation-Cheyenne" in the State of Wyoming sufficient to confer personal jurisdiction over this Defendant. Defendant Kindred Nursing Centers West, L.L.C. may be served at: CT Corporation System, 1712 Pioneer Ave 120, Cheyenne, Wyoming 82001.

4.      Plaintiff is informed and believes that Defendant, Kindred Rehab Services, Inc. is a corporation formed and existing under the laws of the State of Delaware, with its headquarters and principal place of business in the State of Kentucky, but doing business in the State of Wyoming sufficient to confer personal jurisdiction over this Defendant. Defendant Kindred Rehab Services, Inc. may be served at: CT Corporation System, 1712 Pioneer Ave 120, Cheyenne, Wyoming 82001.

5.      Plaintiff is informed and believes that Kindred Healthcare Operating, Inc., is a corporation formed and existing under the laws of the State of Delaware, with its headquarters and principal place of business in the State of Kentucky, but doing business in the State of Wyoming sufficient to confer personal jurisdiction over this Defendant. Defendant Kindred Healthcare Operating, Inc. does not have a registered agent for service of process in the State of Wyoming, service of process

may be made according to the laws of the State of Delaware by serving the Secretary of the State of Delaware.

6.      Defendants Kindred Healthcare, Inc. ("Kindred Healthcare"), Kindred Nursing Centers West, L.L.C. ("Kindred West"), Kindred Rehab Services, Inc. ("Kindred Rehab"), Kindred Healthcare Operating, Inc. ("Kindred Operating") are hereinafter referred to individually as indicated above and collectively as "Corporate Defendants".

## JURISDICTION

7.      The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiff and Corporate Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000 dollars excluding interest and costs.

## VENUE

8.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## CONDITIONS PRECEDENT

9.      All conditions precedent have been performed or have occurred.

10.     Ms. Cardinal has complied with Wyo. Stat § 9-2-1519. *See* Exhibit 1 (Order from Medical Review Panel granting permission to seek relief in Court).

## COMMON ALLEGATIONS OF FACT

11.     That upon information and belief Corporate Defendants are engaged in, among other things, owning, operating, and managing nursing homes and rehabilitation centers, including but not limited to, Kindred Transitional Care and Rehabilitation-Cheyenne, located at 312 Boxeleder

Drive, Cheyenne, Wyoming 82001; Corporate Defendants are the licensed operator of Kindred Transitional Care and Rehabilitation-Cheyenne; and each is a proper party defendant in this case.

12.     That, upon information and belief, Kindred Healthcare owned, operated, supervised, funded and managed Kindred West, Kindred Rehab and Kindred Operating. Kindred Healthcare, controlled or had the right or power to control Kindred West, Kindred Rehab and Kindred Operating. That among other things, Kindred Healthcare charged a management fee and/or other fees to Kindred West, and/or Kindred Rehab and/or Kindred Operating for the management and other services provided by Kindred Healthcare to its nursing homes, including but not limited to the nursing home in this case known as Kindred Transitional Care and Rehabilitation-Cheyenne. That Kindred Healthcare is liable for its own negligent / intentional acts, including those of its officers, directors, employees, agents, assigns, and others acting on its behalf. That Kindred Healthcare is vicariously liable for the negligent acts of its agents and employees and those that Kindred Healthcare controlled or had the right or power to control including the other defendants named in this case. That further, upon information and belief, Kindred Healthcare was acting with the other Corporate Defendants as part of a joint venture and/or as an alter ego concerning the allegations set forth in this Complaint.

13.     On information and belief, during the period at issue, Kindred Operating regularly conducted business in the State of Wyoming and either directly or through its wholly-owned subsidiaries and/or affiliated companies, owned, leased, licensed, operated, administered, managed, directed, and/or controlled numerous skilled nursing facilities in Wyoming, including Defendant Kindred West. Kindred Operating is the sole equity member of Kindred West.

14.     At all relevant times Kindred West, Kindred Healthcare, Kindred Operating and Kindred Rehab owned, operated or managed a nursing home facility in Cheyenne, Wyoming, under the business style of "Kindred Transitional Care and Rehabilitation-Cheyenne." (hereinafter referred to as "Cheyenne Facility").

15.   Ms. Cardinal is informed and believes, and based thereon alleges, that at all times herein mentioned, each of the Defendants was the agent, partner, joint venturer, aider and abetter, alter ego, and/or employee of each of the remaining Defendants, and was acting within the course and scope of such agency, partnership, joint venture, and/or employment or in the capacity of an aider and abetter or alter ego.

16.   At all relevant times Ms. Cardinal was a transitional resident of the Corporate Defendants' Cheyenne Facility admitted solely for rehabilitation and respite care due to her quadriplegia.

17.   At all times material to this action, Corporate Defendants were engaged in the business of for-profit custodial care of elderly, infirm nursing home residents, respite and rehabilitation patients and were the parent corporations and alter ego of the Cheyenne Facility. As a consequence, the Corporate Defendants are responsible for any liability and damages that flow from the misconduct of the other defendants as well as being directly liable for their own independent misconduct. The Corporate Defendants, through its employees and officers, as well as its subsidiary corporations, controlled the operation, planning, management, and quality control of the Cheyenne Facility.

18.   The Corporate Defendants controlled the operation, planning, management, and quality control of the Cheyenne Facility in which Ms. Cardinal was a resident. This includes, but is not limited to, control of marketing, human resources management, training, staffing, creation and implementation of all policy and procedures used by the Cheyenne Facility, federal and state Medicare and Medicaid reimbursement, quality care assessment and compliance, licensure and certification, legal services, and financial, tax, and accounting control through fiscal policies.

19.   Defendant Kindred Operating, as an agent of the other Corporate Defendants, controlled the operation, planning, management and quality control of the Cheyenne Facility in which Ms. Cardinal was a resident. This includes, but is not limited to, control of marketing, human resources management, training, staffing, creation and implementation of all policy and procedures used by the nursing home facility, federal and state Medicare, Medicaid as well as private insurance

reimbursement, quality care assessment and compliance, licensure and certification, legal services, and financial, tax, and accounting control through fiscal policies.

20.     The Corporate Defendants, by holding themselves out as providers and administrators of such skilled services to the public, were at all times relevant hereto responsible for providing a safe environment, high quality nursing, attendant care, rehabilitative services, self-respect and dignity to their patients consistent with their health and safety requirements and needs for protection and with state and federal Medicare and Medicaid nursing home statutes and regulations, as well as the common law standards of due care for nursing, rehabilitative and attendant care.

21.     Corporate Defendants are sued both directly and vicariously. They are sued on theories of principal-agent, respondent superior and vicarious liability for the actions and omissions of their employees and agents who were involved in the hereafter complained of series of negligently neglectful and careless incidents.

22.     At all times relevant hereto nursing assistances, nurses, dietary, rehabilitative and other nursing home staff of Defendants who failed to provide or secure safe and appropriate nursing and other care including; necessary protective care, supervision, adequate nutritional monitoring, properly working warning systems, devices, health needs, safety, adequate risk assessment evaluations, consistent and adequate evaluations, and rehabilitative services and other treatments to Ms. Cardinal were acting within the scope and course of their employment and/or agency with these Corporate Defendants.

23.     Corporate Defendants are also sued directly for their negligent supervision of staff, for inadequate and negligent staffing, for inadequate staff training with respect to the monitoring, supervision, hands-on or standby assistance, safety, and protection for vulnerable patients such as Ms. Cardinal, and for their failure to develop, implement, modify or otherwise assure appropriate individual care plans, policies and procedures necessary for the health, care, dignity, protection and safety of patients such as Ms. Cardinal, all of which actions and omissions have now resulted in the injuries of Ms. Cardinal as complained of herein.

24.    The Corporate Defendants owed to Ms. Cardinal and the other residents a fiduciary duty to use their best efforts and to provide adequate resources to the Cheyenne Facility, so that Ms. Cardinal and the other residents could be adequately cared for. Ms. Cardinal, like the other residents of the Corporate Defendants' Cheyenne Facility, was in great need of restorative care and her family was in great need for respite care. Ms. Cardinal and her family were dependent upon the Corporate Defendants to care for her needs.

25.    The Corporate Defendants owed to Ms. Cardinal a nondelegable duty to provide reasonable and appropriate nursing rehabilitation and psycho-social care during Ms. Cardinal's residency at the Cheyenne Facility for rehabilitation and respite care. The Corporate Defendants, The Board of Directors and/or Officers, Trustees, Members, or Managers of each respective Corporate Defendant, and each of them, had a duty, under applicable federal and state laws (which were designed for the protection and benefit of residents such as Ms. Cardinal) to provide for, and to protect Ms. Cardinal's health and welfare. Defendants, and each of them, also had a common law duty to provide for the health and welfare of Ms. Cardinal. Defendants had, among other duties, the duty with respect to Ms. Cardinal's health and welfare to:

    25.1    Obtain, follow, implement, and adhere to all physician orders through the development of an appropriate care plan;

    25.2    Protect Ms. Cardinal from sustaining injuries to her person;

    25.3    Monitor and accurately record Ms. Cardinal's condition, and notify the attending physician and family members of any meaningful change in her condition;

    25.4    Note and properly react to emergent conditions in a timely fashion, assess the affected site(s) or wounds, measure then call physician, for request or referral to wound clinic or wound specialist to evaluate and treat;

    25.5    Establish, implement and follow a patient care plan for Ms. Cardinal based upon, and including, an ongoing process of identifying her health care needs and making sure that such needs were timely met;

25.6    Accurately assess, monitor and provide for Ms. Cardinal's health, comfort, safety and self-respect through awareness of rehabilitation. Needs to include; assistance with weight shifts; turning in bed; use of special protective devices such as gel cushion for her wheel chair and heel protectors to insure that her admit wounds continued the healing process;

25.7    Maintain accurate records of Ms. Cardinal's health, comfort, safety, dignity and decline, or any other change noted in Ms. Cardinal as she was incapable of noting any physical change due to the total loss of sensation from her spinal cord injury;

25.8    Attend to and maintain Ms. Cardinal's personal hygiene, catheter care and adherence to bowel program for prevention of infection;

25.9    Properly and safely provide for Ms. Cardinal's nutritional and hydration requirements for promotion of healing pressure sores and preventing further skin breakdown;

25.10   Ensure that Ms. Cardinal received appropriate nutrition, liquids, supplements, and medicines required to maintain and improve her health;

25.11   Provide Ms. Cardinal with appropriate medical assessments and nursing care;

25.12   Provide for Ms. Cardinal's rehabilitation needs;

25.13   Maintain trained, qualified, and licensed nursing and other staffing at levels adequate to meet the needs of Ms. Cardinal and other residents;

25.14   Provide training for quadriplegia care to all staff;

25.15   Provide sufficient supervision to Ms. Cardinal, a vulnerable resident, to ensure her safety, and well-being;

25.16   Treat Ms. Cardinal with dignity, respect, and protect her from abuse or neglect.

26.    The continuing pattern of misconduct engaged in by said Defendants, and each of them, as alleged above, manifested itself in the following specific ways with respect to Ms. Cardinal by failing or refusing to timely investigate and document Ms. Cardinal's injuries and medical declines, and by failing or refusing to notify Ms. Cardinal's family members, and acute-care personnel wound care services, Cheyenne Regional Medical Center of such injuries and conditions.

27.     Ms. Cardinal's injuries were proximately caused by the negligence and other misconduct of the Corporate Defendants, in the following particulars:

27.1    Failure to provide sufficiently trained staff and personnel to attend to the reasonable needs of the residents of the Cheyenne Facility.

27.2    Failure to provide proper and appropriate training for personnel to attend to the reasonable needs of the residents of the Cheyenne Facility.

27.3    Failure to provide proper and appropriate supervision and monitoring of personnel who attend to the reasonable needs of the residents of the Cheyenne Facility.

27.4    Failure to maintain and protect the physical safety of its residents, including Ms. Cardinal.

27.5    Failure to follow physicians' orders.

27.6    Failure to progressively care plan condition changes.

27.7    Failure to protect persons seeking rehabilitation and respite care from harm.

27.8    Failure to properly and appropriately manage monies.

27.9    Failure to timely respond to changing condition of a patient and failure to notify physician and family of change in condition of Ms. Cardinal.

27.10   Failure to supervise its management, including but not limited to, the Nursing Home Administrator and Director of Nursing.

27.11   Failure to generate an incident report for changes in Ms. Cardinal's decubitus ulcers, missed bowel programs and catheter care.

28.     As a result of said Corporate Defendants' continuing pattern of conduct, as alleged above, Ms. Cardinal suffered the following damages for which Ms. Cardinal is seeking compensation;

28.1    Severe personal injuries, including, but not limited to, Stage III-IV decubitus ulcers[1] on multiple areas of her body, including but not limited to her buttock, coccyx, left heel, right and left hip, urinary tract infections, wound infections, sepsis, hypothermia, anxiety, malnourishment, autonomic dysreflexia, as well as mental and emotional distress, all to her damage in a sum that will be proven at trial;

28.2    Loss of self-worth and dignity.

28.3    Medical expenses, according to proof at trial, and

28.4    General and special damages in an amount that will be proven at trial.

29.    On October 23, 2012, Ms. Cardinal became a resident of the Corporate Defendants' Cheyenne Facility for the admission which continued through November 29, 2012, when she was admitted to Cheyenne Regional Medical Center ("CRMC"), diagnosed with sepsis, hypothermia, leukocytosis, bone deep sacral and right hip decubitus ulcers, rule out osteomyelitis[2], quadriplegia and status post suprapubic catheter placement.

30.    Ms. Cardinal was discharged from CRMC and circumstances gave her no choice but to return to the Cheyenne Facility on December 20, 2012 to receive continued rehabilitative care and treatment for her decubitus ulcers and osteomyelitis..

31.    Ms. Cardinal remained at the Cheyenne Facility through February 23, 2013. After discharge, Ms. Cardinal returned to her mother's home where she continued to receive treatment from Rocky Mountain Infectious Disease in Casper, Wyoming for her decubitus ulcers and osteomyelitis.

---

[1] Decubitus ulcers, also known as "pressure sores" or "bedsores," develop from pressure on the skin, such as when an immobile individual lies in bed or sits for long periods; they can be avoided by repositioning the individual every couple of hours. Risk for decubitus ulcers is increased by lack of basic hygiene, prolonged contact with urine or feces, failure to keep the affected area clean, nutritional an hydration compromise.

[2] Osteomyelitis – an infection of the bone, a rare but serious condition. Infection in one part of the body may spread through the bloodstream into the bone and expose bone to infection.

32.     At the time of Ms. Cardinal's admission to the Cheyenne Facility on October 23, 2012 and subsequently thereafter, she was assessed as a risk for skin breakdown secondary to being wheelchair bound and unable to reposition herself. This would be the case for any person who is unable to shift their own weight, is confined to a wheelchair or bed, who has poor nutrition, hydration and personal hygiene.

33.     Ms. Cardinal was transferred on November 29, 2012 to CRMC in Cheyenne, Wyoming, after a series of negligent acts and omissions in care plan allowed her to deteriorate physically, including but not limited to, multiple pressure ulcers about her body, malnourishment, dehydration, osteomyelitis, urinary tract infection, hypothermia, and autonomic dysreflexia[3] and for other injuries between October 23, 2012 and November 29, 2012.

34.     At the time of her admission to the Cheyenne Facility on October 23, 2012, and subsequently thereafter, Ms. Cardinal was completely dependent on the Corporate Defendants for 24-hour nursing care and close skin care monitoring, supervision for care and treatment of multiple healing decubitus ulcers, mood disorders and quadriplegia, and to provide respite care for family who were experiencing care giver burn out.

35.     At the time of her admission to the Cheyenne Facility on October 23, 2012 and subsequently thereafter, Ms. Cardinal was noted to have personality disorders due to her spinal cord injury, as demonstrated by rare behavioral issues.

36.     At the time of her admission to the Cheyenne Facility on October 23, 2012, and subsequently thereafter, Ms. Cardinal was a vulnerable adult who relied on the staff employed by Defendants  for assistance with basic activities of daily living, to include nutritional and fluid intake, bowel program and close monitoring of skin issues.

---

[3] Autonomic Dysreflexia- an uncomfortable and frightening response to something being wrong somewhere in the body that needs to be addressed. Caused by urinary tract infections, overfull bladder, overfull bowel, pressure sores and extreme or quick temperature changes.

37.     According to the medical records, Ms. Cardinal was at high risk for decubitus ulcers.

38.     According to the medical records, Ms. Cardinal was dependent on the Cheyenne Facility for her activities of daily living, including repositioning and weight shifting of her body to prevent decubitus ulcers, promote healing of decubitus ulcers present on admit, for her nourishment and hydration.

39.     According to the medical records, Ms. Cardinal suffered multiple, repeated and chronic decubitus ulcers, including but not limited to, Stage IV decubitus ulcer on her coccyx, Stage II-IV decubitus ulcers wounds on the sacrum and coccyx, Stage IV decubitus ulcer of her right buttock, Stage III-IV decubitus ulcers in the hip region, including a Stage IV decubitus ulcer wound of the right hip region.

40.     According to the medical records, Ms. Cardinal weighed 140 lbs. on admission to the Cheyenne Facility, but was diagnosed as malnourished upon her admission to CRMC only thirty-seven (37) days later.

41.     Defendants failed to update a care plan after they knew Ms. Cardinal had several changes in condition, to include worsening of present decubitus ulcers, additional skin breakdown, urinary tract infection, and bowel incontinence secondary to failure of staff to adhere to bowel program.

42.     Defendants failed to provide, follow up and make appropriate changes to her care plan.

43.     Defendants failed to do proper nursing assessments.

44.     Defendants failed to properly document assessments, care given, response to care given, and medications and treatment and general nursing care documentation required for proper care and communications between shifts.

45.     Defendant's failed to follow the physician's orders.

46.     According to the medical records, Defendants failed to notify the physician and family of Ms. Cardinal's needs and changes in condition.

47.     Defendants failed to follow recommendations made by registered dietician concerning the poor nutritional intake of Ms. Cardinal.

48.     According to the medical records, Ms. Cardinal did not consistently or routinely receive hygiene care, proper nutrition, hydration, or catheter care. Her bowel program and wound care plans were rarely followed.

49.     Defendants failed to follow proper protocol to prevent decubitus ulcers on a resident with moderate to high risk for decubitus ulcers.

50.     Defendant failed to follow proper protocol to treat decubitus ulcers on a resident at moderate to high risk for pressure sores.

51.     Defendants failed to educate care staff on recognizing signs that occur in quadriplegic patients when there is a change in their overall status.

52.     At all relevant times, the Corporate Defendants held a fiduciary position of trust toward Ms. Cardinal and toward her family, and owed to her the highest duties of good care, adequate staffing, proper physical protection, candor and truthfulness, her dignity and self-worth.

53.     The Corporate Defendants breached and violated their duties toward Ms. Cardinal, and toward her family, and did so with knowledge and forethought and purpose, for the sake of enhancing its corporate profits and pecuniary gain and with the further objective of concealing their own wrongdoing.

54.     The negligence, inattention, and misconduct of the Corporate Defendants were committed as part of a pattern of wrongdoing on the part of the Corporate Defendant.

55.     Ms. Cardinal was injured and damaged as a result of the misconduct, fraud, and misrepresentation of the Corporate Defendants.

56.     Severe mental undo stress related to an already deteriorating spousal and family relationship brought on by caregiver burnout, guilt and suffering by Ms. Cardinal, her husband, and three children.

57.     At all relevant times, Kindred Operating, had a duty to properly manage the Cheyenne Facility in all manners as it relates to the care and treatment of the frail, vulnerable population of elderly, rehabilitation and respite patients assigned to their care.

58.    Kindred Operating breached and violated its duties toward Ms. Cardinal and toward her family, and did so with knowledge and forethought and purpose.

59.    Ms. Cardinal was injured and remains damaged both physically and mentally to this day as a result of the misconduct, fraud, and misrepresentation of Kindred Operating.

60.    The negligence, inattention, and misconduct of Kindred Operating was committed as part of a pattern of wrongdoing on the part of the management company for profit, by lack of good care makes for longer admission. In Ms. Cardinal's case the result was two admits, the second of which was a high acuity and higher financial reimbursement rates from Medicare and Medicaid.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE AGAINST ALL DEFENDANTS)

61.    Ms. Cardinal incorporates paragraphs 1 - 60 and makes the same a part hereof as if fully set forth herein.

62.    The Corporate Defendants' Cheyenne Facility, at all times pertinent hereto, was a nursing home licensed by the State of Wyoming.

63.    The Corporate Defendants, including Kindred Healthcare, Kindred Operating, Kindred West, Kindred Rehab, all times pertinent hereto, were the owners and/or operators of the Cheyenne Facility.

64.    Defendant Kindred Operating, at all times pertinent hereto, had responsibilities for the management and operation of the Cheyenne Facility.

65.    Defendants held themselves out to be specialists in the field of nursing home care with the expertise to maintain the health and safety of persons unable to care for themselves, such as Ms. Cardinal.

66.    As Ms. Cardinal was a paying resident of said nursing home, each Corporate Defendant, by and through its employees, had contractual and other duties to provide competent nursing and other care to Ms. Cardinal as required by law and consistent with community standards.

67.     Notwithstanding said duties, from October 23, 2012 and November 29, 2012, and from December 20, 2012 to February 23, 2013 Ms. Cardinal suffered from urinary tract infection, malnutrition, dehydration, bone deep pressure ulcers, hypothermia and leukocytosis.

68.     As a direct and proximate result of her decubitus ulcers, Ms. Cardinal suffered multiple and various infections of her body, and severe autonomic dysreflexia.

69.     The Corporate Defendants negligently failed to properly train its staff in caring for Ms. Cardinal and others like her who were dependent on staff to attend to their own health and safety needs and were confined to a nursing home.

70.     The Corporate Defendants negligently failed to hire or train competent staff to care for Ms. Cardinal and others like her confined to a nursing home.

71.     Defendants knowingly and willfully documented material and false statements in the medical record pertaining to the assessments of Ms. Cardinal.

72.     Defendants negligently failed to properly train its staff in keeping accurate nursing care and other treatment notes.

73.     Defendants were further  negligent and substandard in at least, but not limited to, the following particulars:

    73.1    In failing to employ necessary and vital equipment;

    73.2    In failing to progressively care plan where conditions changed;

    73.3    In failing to provide adequate staffing;

    73.4    In failing to properly train staff regarding special needs of a quadriplegic;

    73.5    In failing to provide proper supervision and monitoring of staff;

    73.6    In failing to provide accurate and timely assessment;

    73.7    In failing to develop and follow care plan;

    73.8    In failing to prevent decubitus ulcers;

    73.9    In failing to prevent urinary tract infection;

    73.10   In failing to properly treat and access decubitus ulcers;

73.11   In failing to provide quality of care within state and federal guidelines;

73.12   In failing to follow physician's orders;

73.13   In repeatedly failing to maintain activities of daily living;

73.14   In repeatedly failing to prevent malnutrition and or significant weight loss;

73.15   In repeatedly failing to prevent episodes of autonomic dysreflexia;

73.16   In repeatedly failing to update care plan after any change in Ms. Cardinal's condition;

73.17   In repeatedly failing to seek treatment orders from physician;

73.18   In repeatedly failing to provide a sufficient number of qualified staff;

73.19   In failing to prevent infection;

73.20   In failing to prevent dehydration;

73.21   In failing to provide care with dignity;

73.22   In repeatedly failing to and document results of bowel program;

73.23   In repeatedly failing to provide effective administration;

73.24   In repeatedly failing to maintain medical records in accordance with professional standards;

73.25   In failing to develop and implement an  individualized plan of care for decubitus ulcers;

73.26   In failing to address changes, improvements, and declines in condition and revise the interventions as appropriate based on Ms. Cardinal's response, outcomes and needs;

73.27   In failing to notify a physician and family promptly of change in condition;

73.28   In failing to protect frail, vulnerable persons;

73.29   In failing to provide adequate and timely emergency care for Ms. Cardinal;

73.30   In failing to properly manage monies;

73.31   In failing to supervise its management, including but not limited to, the Nursing Home Administrator and Director of Nursing.

74.   The failures of the Corporate Defendants to provide or obtain proper and timely nursing, professional and other care, supervision, evaluation, monitoring and safety precautions, were breaches of their duties of due care to Plaintiff and a significant causative factor in Ms. Cardinal's avoidable injuries.

75.   More specifically, but not limited to, during Ms. Cardinal's care, the Corporate Defendants' nurses, staff, employees, and agents negligently monitored and failed to properly assess and care for Ms. Cardinal despite the healing decubitus ulcers present at admit and her risk for decubitus ulcers.

76.   At all times pertinent hereto, Ms. Cardinal was unable to care for herself and was under the exclusive control and care of the Corporate Defendants and their employees.

77.   The Corporate Defendants breached and violated their duties toward Ms. Cardinal and toward her family, and did so with knowledge and forethought and purpose, for the sake of enhancing its corporate profits and pecuniary gain.

78.   Ms. Cardinal has been injured and damaged as a result of the misconduct and negligence of each Defendant.

79.   The direct actions and omissions of the Corporate Defendants and their agents and employees acting within the scope of their agency and employment, as set forth above, also constituted a negligent breach of their duties of due care owed to Ms. Cardinal to provide reasonably appropriate and high quality nursing, and any other care, supervision and rehabilitative services necessary to meet her needs and assure her own safety needs for close supervision, monitoring, physical safety and protection.

80.   As a direct and proximate result of the above-mentioned conduct, all of which was negligent and substandard, Ms. Cardinal was damaged as previously described in this Complaint, and she is entitled to damages as allowed under applicable Wyoming law.

//

//

## SECOND CAUSE OF ACTION
### (NEGLIGENCE *PER SE* AGAINST ALL DEFENDANTS)

81.     Plaintiff incorporates paragraphs 1 - 80 and makes the same a part hereof as if fully set forth herein.

82.     The Corporate Defendants owed a non-delegable fiduciary duty to residents, including Ms. Cardinal, to provide adequate financial and other resources to care for their residents and to hire, train, and supervise employees so that they could properly deliver care and services to residents in a safe and beneficial manner in order to assist and ensure that the residents attain and maintain the highest practicable level of physical, mental, and psychosocial well-being. The Defendants breached this duty.

83.     The Corporate Defendants at all times relevant hereto failed to provide a sufficient number of trained, experienced and competent personnel; failed to provide appropriate care and supervision and safety for all patients and residents and failed to ensure that their needs were met and that they remained free of accidents or injury, and failed to ensure dignity, all in violation of the regulations for licensing of long-term care health facilities in Wyoming, both the Health Care Financing Administration, U.S. Department of Health and Human Services, 42 C.F.R. Part 483, and the Rules and Regulations for Licensure of Nursing Care Facilities of the Wyoming Department of Health, pursuant to the Health Facilities act at W.S. §35-2-901 *et seq.* and the Wyoming Administrative Procedures Act at W.S. §16-3-101 *et seq.*

84.     Defendants failed to comply with the requirements of 42 C.F.R. §483.25:

42 CFR §483.25 QUALITY OF CARE

Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychological ·well-being, in accordance with the comprehensive assessment and plan of care.

\*\*\*\*\*\*\*\*

§483.25(a)(3): A resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene.

85.    Defendants failed to comply with 42 C.F.R. § 483.30:

§483.30 NURSING SERVICES

The facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care.

86.    Defendants failed to comply with 42 C.F.R. §483.15:

42 C.F.R. §483.15  QUALITY OF LIFE

§483.15(a) - Dignity The facility must promote care for residents in a manner and in an environment that maintains or enhances each resident's dignity and respect in full recognition of his or her individuality.

87.    Defendants failed to comply with 42 C.F.R. §483.20:

42 C.F.R. §483.20 RESIDENT ASSESSMENT

§483.20 Resident Assessment The facility must conduct initially and periodically a comprehensive, accurate, standardized reproducible assessment of each resident's functional capacity.

§483.20(b) Comprehensive Assessments

§483.20(b)(l) Resident Assessment Instrument. A facility must make a comprehensive assessment of a resident's needs, using the RAI specified by the State. The assessment must include at least the following: ....(iii)

Cognitive patterns. (iv) Communication. (v) Vision. (vi) Mood and behavior patterns. (vii) Pychological well-being. (viii) Physical functioning and structural problems. (ix) Continence. .....(xii) Skin Conditions. (xiii) Activity Pursuit. (xix) Medications. (xv) Special Treatments and procedures. (xvi) Discharge potential. (xvii) Documentation of summary information regarding the additional assessment performed through the resident assessment protocols. (xviii) Documentation of participation in assessment.

88.  Defendants failed to comply with 42 C.F.R. §483.20:

42 C.F.R. §483.20(j) PENALTY FOR FALSIFICATION

§483.20(j) Penalty for Falsification (1) Under Medicare and Medicaid, an individual who willfully and knowingly-- (i) Certifies a material and false statement in a resident assessment is subject to a civil money penalty of not more than $1,000 for each assessment; or (ii) Causes another individual to certify a material and false statement in a resident assessment is subject to a civil money penalty or not more than $5,000 for each assessment. (2) Clinical disagreement does not constitute a material and false statement

89.  Defendants failed to comply with 42 C.F.R. §483.20(d) and §483.20(k):

42 C.F.R. §483.20(d), AND §483.20(k)(3)(1)

§483.20(d) (A facility must..) use the results of the assessments to develop, review and revise the resident's comprehensive plan of care.

§483.20(k) Comprehensive Care Plans (1) The facility must develop a comprehensive care plan for each resident that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment.

90.  Defendants failed to comply with 42 C.F.R. §483.20(g):

42 C.F.R. §483.20(g)

The assessment must accurately reflect the resident's status. A registered nurse must conduct or coordinate each assessment with the appropriate participation of health professionals. A registered nurse must sign and certify that the assessment is completed.

Under Medicare and Medicaid, an individual who willfully and knowingly certifies a material and false statement in a resident assessment is subject to a civil money penalty of not more than $1,000 for each assessment; or an individual who willfully and knowingly causes another individual to certify a material and false statement in a resident assessment is subject to a civil money penalty of not more than $5,000 for each assessment. Clinical disagreement does not constitute a material and false statement.

91.   Defendants failed to comply with 42 C.F.R. §483.20(k)(3), and 42 C.F.R. §483.20(k)(3)(ii):

   42 C.F.R. §483.20(k)(3)

   §483.20(k)(3): (3) The services provided or arranged by the facility must-- (i) Meet professional standards of quality and; (ii) must be provided by qualified persons in accordance with each resident's written plan of care.

92.   Defendants failed to comply with 42 C.F.R. § 483.25 Quality of Care:

   42 C.F.R. §483.25 QUALITY OF CARE

   §483.25 Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care.

93.   Defendants failed to comply with 42 C.F.R. §483.25(a)(l) and (3):

   42 C.F.R. §483.25(a) ACTIVITIES OF DAILY LIVING

§483.25(a) Activities of Daily Living. Based on the comprehensive assessment of a resident, the facility must ensure that §483.25(a)(l) A resident's abilities in activities of daily living do not diminish unless circumstances of the individual's clinical condition demonstrate that diminution was unavoidable. § 483.25(a)(3) A resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene.

94.    Defendants failed to comply with 42 C.F.R. § 483.26(d)(2):

42 C.F.R. §483.25(d)(2) URINARY INCONTINENCE

§483.25(d)(2). A resident who is incontinent of bladder or has a catheter receives appropriate treatment and services to prevent urinary tract infections and to restore as much normal bladder function as possible.

95.    Defendants failed to comply with 42 C.F.R. §483.25(c):

42 C.F.R. §483.25(c) Pressure Sores.

Based on the comprehensive assessment of a resident, the facility must ensure that a resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable, and a resident having pressure sores receives necessary treatment equipment and services to promote healing, prevent infection and prevent new sores from developing.

96.    Defendants failed to comply with 42 C.F.R. §483.30(a)(l):

42 C.F.R. §483.30(a)(l)

The facility must provide services by sufficient numbers of each of the following types of personnel on a 24-hour basis to provide nursing care to all residents in accordance with resident care plans:

(i)Licensed nurses; (ii) Other nursing personnel (CNA's); (iii) Registered Dietician, (iv) Rehabilitation, ie. physical and occupational therapy.

97.     Defendants failed to comply with 42 C.F.R. §§483.35(b), (c)(l)-(3) and (h)(2):

42 C.F.R. §483.35(b)

The facility must employ sufficient support personnel competent to carry out the functions of the dietary services.

98.     Defendants failed to comply with 42 C.F.R. §483.35(c):

42 C.F.R. §483.35(c)

Menus must meet the nutritional needs of residents in accordance with the recommended dietary allowances of the Food and Nutrition Board of the National Research Council, National Academy of Sciences, be prepared in advance, and be followed.

99.     Defendants failed to comply with 42 C.F.R. §483.65:

42 C.F.R. §483.65

The facility must establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of disease and infection.

100.    Defendants failed to comply with 42 C.F.R. §483.75

42 C.F.R. §483.75 ADMINISTRATION

§483.75 Administration A facility must be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.

101.   Defendants failed to comply with 42 C.F.R. §483.75(b):

42 C.F.R. §483.75(b) COMPLIANCE WITH FEDERAL, STATE, AND LOCAL LAWS AND PROFESSIONAL STANDARDS:

§483.75(b) The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility.

102.   Defendants failed to comply with 42 C.F.R. §483.75(l)(1)

42 C.F.R. §483.75(l) CLINICAL RECORDS

The facility must maintain clinical records on each resident in accordance with accepted professional standards and practices that are complete, accurately documented, readily accessible, and systematically organized.

The clinical records must contain sufficient information to identify the resident; a records of the resident's assessments; the plan of care and services provided; the results of any preadmission screening conducted by the State; and progress notes.

103.   Defendants failed to comply with the requirements of the Wyoming Department of Health Aging Division, Chapter 11, including but not limited to:

SECTION 11. DIETETIC SERVICES. (a) Dietary Supervision. Overall supervisory responsibility for the dietetic service shall be assigned to a full-time qualified dietetic supervisor.

(1) If the qualified supervisor is not a Registered Dietitian, she/he shall be a graduate of a dietetic technician program approved by the American Dietetic Association or a dietary managers' educational program approved by the Certifying Board for Dietary Managers. Training and experience in food service supervision and nutrition

equivalent in content to the approved educational programs are acceptable.

104.    As a direct and proximate result of said violations of regulations, Ms. Cardinal was exposed to risk of injury from abuse, mistreatment or neglect, and did in fact suffer such injury as a result thereof.

105.    As a direct and proximate result of such negligence, gross negligence, flagrant, willful, wanton, reckless and/or intentional conduct, Ms. Cardinal suffered injuries that were foreseeable to Defendants.

106.    Defendants' violation of the above stated regulations is negligence *per se*.

107.    As a direct and proximate result of Defendants' negligence *per se*, Ms. Cardinal is entitled to damages for medical expenses, together with all other damages allowed under applicable Wyoming law.

## THIRD CAUSE OF ACTION
### (RESPONDEAT SUPERIOR)

108.    Plaintiff Ms. Cardinal incorporates paragraphs 127 and makes the same a part hereof as if fully set forth herein.

109.    Based upon contract and agreement, apparent authority and agency, or law, each Corporate Defendant is legally or vicariously responsible for the actions of the nurses, staff, employees and agents of the Cheyenne Facility.

110.    The Corporate Defendants are vicariously liable for any and all negligence of their nurses, staff, agents, and employees under the doctrine of *respondeat superior*. The Corporate Defendants were, therefore, negligent in the health care that they rendered to Ms. Cardinal.

111.    As a result of the negligence of the Corporate Defendants and their nurses, staff, agents, and employees, Ms. Cardinal is entitled to damages for medical expenses, together with all other damages allowed applicable Wyoming law.

112.    Ms. Cardinal seeks recovery for damages caused by the negligence of the Corporate Defendants, their agents, servants, and employees, including but not limited to, pecuniary loss, mental anguish and suffering of Ms. Cardinal, and reasonable medical expenses of Ms. Cardinal, and such other damages as are compensable under Wyoming law.

WHEREFORE, Plaintiff Ms. Cardinal requests that judgment be entered in her favor and against Defendant Kindred Healthcare, Kindred Operating, Kindred West, Kindred Rehab, and the Cheyenne Facility, for damages in such amount as the trier of fact determines to be just and proper; for exemplary damages for Defendants' said misconduct and to dissuade them and others similarly situated from engaging in similar misconduct in the future; for costs of this action; and for pre-judgment and post-judgment interest, costs, attorney fees, expert witness fees and such other and further relief as this Court deems just and proper in these circumstances.

Dated this 14th day of April, 2015.

Respectfully Submitted,

N. Joshua Dart, WSB #7-4634
Dart Law Firm, P.C.
1401 South Taft Avenue, Suite 203
Loveland, Colorado 80537
970 541 4441
*nj@dartfirm.com*